This appeal followed.
III. Standard of Review
This appeal involves the interpretation of Arkansas Code Annotated section 14-92-240. We use a de novo standard of review when deciding the question of the correct application and interpretation of an Arkansas statute because it is a question of law. Broussard v. St. Edward Mercy Health Sys., Inc. , 2012 Ark. 14, 386 S.W.3d 385. In statutory-construction matters, we give effect to the intent of the General Assembly as the basic rule. Nolan v. Little , 359 Ark. 161, 165, 196 S.W.3d 1, 3 (2004). In determining the meaning of a statute, we construe it just as it reads, giving the words *274 their ordinary and usually accepted meaning in common language. Id. This court construes the statute so that no word is left void, superfluous, or insignificant, and meaning and effect are given to every word in the statute if possible. Id.
We do not resort to rules of statutory construction when the language of a statute is plain and unambiguous and conveys a clear and definite meaning. Id. However, this court will not give statutes a literal interpretation if it leads to absurd consequences that are contrary to legislative intent. Id. This court takes pains to reconcile statutory provisions to make them consistent, harmonious, and sensible. Id.
However, when the meaning is not clear, we look to "the subject matter, the object to be accomplished, the purpose to the [sic] served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject." Walther v. FLIS Enters., Inc. , 2018 Ark. 64, 540 S.W.3d 264. A statute is ambiguous only when it is open to two or more constructions or when it is of such obscure or doubtful meaning that reasonable minds might disagree or be uncertain as to its meaning. Crayton v. State , 2018 Ark. App. 110, at 4, 543 S.W.3d 544, 546-47.
With these standards in mind, we will now consider the interpretation of Arkansas Code Annotated section 14-92-240.
IV. Analysis
Arkansas Code Annotated section 14-92-240 subsections (a) and (b) set forth the process by which a suburban improvement district may change the method of selecting a board of commissioners from appointment to election. Subsections (c) and (d) set forth the process by which commissioners shall be nominated and elected once the initial change to an election method has been made. Subsection (e) simply states that any notice required under the section shall be given by first class mail.
We have three issues before us on appeal:
1. Is HISID required to provide notice to each timeshare owner?
2. Are timeshare owners "property owners" who are eligible to vote in HISID elections? If so, how many votes are they entitled to?
3. Are HISID's additional requirements to qualify as a nominee for commissioner or to vote invalid?
These issues relate to the process involved in the nomination and election of successor commissioners. Thus, subsection (c) of the statute is the focus of our analysis in this appeal. It provides as follows:
(c)(1)(A) Not more than sixty (60) days nor less than thirty (30) days after the measure is approved, the quorum court member who conducted the election under subsection (b) of this section shall hold a meeting to accept nominations for the new commissioners. Nominations for commissioners shall be made by property owners.
(B) The commissioners shall be elected, from among those nominated, at a subsequent public meeting to be held not less than thirty (30) days after the meeting to nominate commissioners.
(C) Notice of the meetings shall be mailed to each property owner at least thirty (30) days prior to the meeting to nominate commissioners.
(D) The notice shall include the following information:
(i) The time, place, and date of the meetings to nominate and elect a new board of commissioners;
(ii) How to request an absentee ballot; and *275 (iii) The qualifications for voting in the election.
(2) Each property owner in attendance at the meeting to nominate shall be entitled to nominate one (1) district resident property owner. Each property owner shall be entitled to one (1) vote for each position of commissioner to be filled. A property owner may cast his or her vote in person at the meeting conducted to elect commissioners or may vote by an absentee ballot. Absentee ballots must be received prior to the meeting held to elect commissioners. Any absentee ballot may be requested by any property owner.
(3)(A) A meeting shall be held annually to nominate successor members, and a subsequent meeting shall be held to elect successor members.
(B) The annual meetings shall be conducted by the board.
(C) The same notice requirements as for the initial meetings for nomination and election of commissioners shall apply to the annual meetings for nomination and election of commissioners.
(4) The cost of the election held to select commissioners under this subsection shall be borne by the district.
By its plain language, this subsection provides that "property owners" are entitled to nominate candidates for commissioner and are entitled to one vote for each position of commissioner to be filled. The question and the point of analysis then becomes who are "property owners" for purposes of the statute. More pointedly, are timeshare owners "property owners" for purposes of the statute?
We first note that the term "property owner" is not expressly defined by the statute. The statute does, however, define "land" or "real property" as "all property subject to taxation for the purposes of this subchapter." Is a timeshare estate property subject to taxation under the statute? We conclude that it is.
A time-share estate is an estate in real property and has the character and incidents of an estate in fee simple at common law; it also constitutes a separate estate or interest in property, except for real property tax purposes. Ark. Code Ann. § 18-14-104(a), (c) (Repl. 2015). So, a timeshare owner technically "owns" property. Each timeshare owner is issued a deed in his or her name, which is then recorded. While the timeshare owners do not receive an individual tax bill or an individual assessment, the property itself is assessed real property taxes by the assessor and improvement-district assessments by HISID, which are then paid by the timeshare owners through TRL-in other words, a timeshare owner owns property subject to taxation. Thus, under a plain reading of the statute, a timeshare owner satisfies the definition of a "property owner" entitled to notice.
Because a timeshare owner satisfies the definition of a "property owner" under the statute, timeshare owners are entitled to individual notice of commissioner elections and are also entitled to the right to vote. How many votes are they entitled to? The statute clearly and unambiguously states that "[e]ach property owner shall be entitled to one (1) vote for each position of commissioner to be filled." Ark. Code Ann. § 14-92-240(c)(2) (emphasis added). Thus, when we apply our rules of statutory construction, it is clear that each timeshare owner is a property owner and that each is entitled to one vote for each position of commissioner to be filled.
HISID argues that this interpretation reaches an absurd result. They assert that there are potentially 51 "owners" of each individual timeshare unit-resulting in 1428 possible "owners" on fewer than 10 *276 lots. HISID takes the position that this outcome clearly dilutes the voting rights of other individual property owners and urges this court not to give the statute a literal interpretation that leads to such an absurd result. It is true that this court generally will not give statutes a literal interpretation if it leads to absurd consequences that are contrary to legislative intent. Nolan , 359 Ark. at 165, 196 S.W.3d at 3. Here, however, the language of the statute is clear and unambiguous. We have looked at the subject matter, the object to be accomplished, the purpose to the served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject and cannot ascertain that anything other than this result was contemplated by the legislature. In fact, in this same legislation, the legislature created a different process for effectuating a change from appointment to election of commissioners. In section 14-92-240(b)(4), the legislature provided that "[t]wo (2) votes shall be awarded for each property. The interests of the time-share owners shall be voted by the time-share owners' association on the same basis." The fact that the legislature set up one procedure in subsection (b) of the statute and then set up a completely different procedure in the very next subsection strongly suggests that the legislature did not intend for the elections to be carried out the same way.
Accordingly, we do not find that this interpretation is contrary to legislative intent. We conclude that the legislature intended timeshare owners to have "some" voice in the election of commissioners. There is no doubt that the timeshare owners have an interest in the improvement for which the district was formed and that they are assessed a fee, albeit indirectly, for that improvement. It would be fundamentally unfair to prevent them from having a voice in its administration. Moreover, if the legislature did not intend for them to have any voice, the legislature would not have given them a voice in whether the commissioners were elected or appointed. As a result, we are unable to say that this result was contrary to the legislative intent. Thus, we hold that the individual timeshare owners have a right to cast a ballot in commissioner elections, one vote for each position of commissioner to be filled.
Appellants next challenge HISID's regulations that require additional qualifications for the nomination and election of commissioners. More specifically, appellants challenge HISID's requirement that nominees and voters not be delinquent in their assessments or utility bills and limits eligible voters to the first two names on the deed in the case of multiple ownership and requires that past-due assessments be paid before the close of business the day preceding the election. We agree these additional requirements are invalid.[1]
The legislature detailed the power and the authority given to the board in section 14-92-210 :
In addition to, and not by way of limitation of the powers prescribed in § 14-92-220,[2 ] the board of commissioners of a suburban improvement district shall have the powers to:
*277 (1) Make and execute all contracts, leases, conveyances, and other instruments of the district;
(2) Join with any other political subdivision, municipality, district, or governmental agency, either state or federal, in the acquisition, construction, maintenance, operation, and financing of any of the facilities, works, or operations authorized by this subchapter or as to the performance of any of its functions;
(3) Establish rules and regulations for the transaction of the district's business and for the services, use, and right to use of its facilities or services, or both, or to effectuate any purpose of this subchapter;
(4) Do all things incidental or auxiliary to the exercise of the express powers granted by this subchapter; and
(5) Perform all actions useful to carry out the purposes of this subchapter, unlimited by any express provision of it.
While paragraphs 3 through 5 are somewhat generic in their wording, Arkansas Code Annotated section 14-92-240(c) explicitly sets out the qualifications of commissioners and voters under the statute and unambiguously provides for the number of votes each property owner may cast in the elections. Nothing in the plain wording of section 14-92-210 gives the district the authority to alter those requirements. Therefore, we must conclude that HISID acted outside its authority in enacting these regulations.
Reversed and remanded.
Gruber, C.J., and Virden, J., agree.

We note that HISID may have created other regulations relating to the nominations and elections of commissioners. For example, it appears that trusts are given two votes pursuant to current HISID regulations. We have not been specifically asked to make a determination regarding the validity of these other requirements and therefore decline to do so.

This deals with the authority of the board to hire and fire employees, sell, buy, or lease equipment, and accept gifts.